Argued and submitted September 11, 2000, judgment in favor of Oregon
Department of Transportation reversed and remanded; otherwise affirmed
March 14, 2001

## Shawna McCOMB,
*Appellant,*

*v.*

## Lisa M. TAMLYN
## and State of Oregon,
## by and through its Department of Transportation,
*Respondents.*

## (CCV 97-09-080; CA A105285)

20 P3d 237

Helen T. Dziuba argued the cause and filed the briefs for appellant. With her on the briefs was Law Office of Helen T. Dziuba.

Thomas M. Christ argued the cause for respondent Lisa M. Tamlyn. With him on the brief was Mitchell, Lang & Smith.

Michael C. Livingston, Assistant Attorney General, argued the cause for respondent State of Oregon. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Edmonds, Presiding Judge, and Armstrong and Brewer, Judges.

EDMONDS, P. J.

## EDMONDS, P. J.

Plaintiff was injured when defendant Tamlyn's vehicle hit her while plaintiff was riding her bicycle in a crosswalk. Plaintiff entered the crosswalk with a "Walk" signal, while Tamlyn had a solid green light when she turned into it from a dedicated right turn lane. Plaintiff alleged that Tamlyn was negligent in driving her vehicle and that the state Department of Transportation (the state) was negligent in designing the signals for the intersection. At the close of the evidence, the trial court granted the state's motion for a directed verdict on the ground of discretionary immunity. ORCP 60. The jury then found that plaintiff's negligence was 90 percent of the cause of the accident and that Tamlyn's negligence was 10 percent of the cause. The court entered judgment for both defendants, and plaintiff appeals. We affirm as to Tamlyn and reverse as to the state.

Because the trial court granted the state's motion for a directed verdict, we state the facts most favorably to plaintiff.[1] On November 27, 1996, plaintiff was riding her bicycle south on the sidewalk on the east side of 82nd Street in northern Clackamas County. For several blocks, the sidewalk follows the west side of Clackamas Town Center (the Center), a large shopping mall. When plaintiff arrived at the northern curb of the west entrance road to the Center, she pressed the pedestrian crossing button. At the same time, the signal for the traffic leaving the Center turned red as part of the normal signal cycle. Plaintiff received an immediate "Walk" signal and then rode her bicycle into the crosswalk. At the same time, Tamlyn was driving north on 82nd Street, intending to turn right into the Center at the west entrance. Shortly before arriving at that entrance, she moved into a dedicated right turn lane. She observed a solid green signal, known as a "green ball," for that lane, and she thereafter began making the turn. There was no sign warning cars turning right to look for, or to yield to, pedestrians or others in the

---

[1] Because of the jury's verdict, we would normally state the facts most favorably to Tamlyn in evaluating the appeal as to her. Because plaintiff's only assignment of error concerning Tamlyn does not involve the facts that we describe, we do not need to restate them in order to resolve that portion of the appeal.

crosswalk. At the time, it was dark, and the weather was stormy and wet. There is testimony that plaintiff and Tamlyn did not see each other until Tamlyn hit plaintiff.

When the state designed the intersection in the early 1980s, it established three phases for its traffic signals; on the night of the accident, the signals were operating in accordance with the state's design. The first phase permits traffic on 82nd Street to flow north and south and also permits northbound vehicles to turn right into the Center. The first phase is also the only phase during which pedestrians wishing to use the crosswalk across the entrance road can receive a "Walk" signal; they do so by pushing an appropriate button. At least at the beginning of the first phase, the "Walk" signal appears as soon as the button is pressed. The second phase of the signals stops traffic flowing north on 82nd Street but permits traffic flowing south to proceed. At the same time, those traveling south who wish to enter the Center receive a left turn arrow, and those wishing to leave the Center by turning north on 82nd Street also receive an appropriate signal. In the third phase, the signals stop both north and south traffic on 82nd Street, while those wishing to leave the Center in either direction receive signals permitting them to so. Also in the third phase, those traveling north on 82nd Street in the dedicated right turn lane receive a green ball signal that permits them to turn into the Center. Significantly, the green ball signal remains lit when the signals change from the third phase back to the first phase. In the second and third phases pedestrians wishing to use the crosswalk receive a "Don't Walk" signal. The signals change from phase to phase in the order described, so long as there is traffic wishing to make the various movements. If no traffic wishes to enter or leave the Center, the signals remain in the first phase indefinitely.

■ Plaintiff based her negligence claim against the state on its design of the signal system at the intersection. In her amended complaint, she alleged that the state was negligent:

"1. In synchronizing a 'walk' signal that gives an instantaneous 'walk' pedestrian signal without any notice

or warning to northbound drivers who wish to turn right onto SE McBride.[2]

"2. In synchronizing a walk signal that sends people into the crosswalk in the path of oncoming vehicles."

At trial, plaintiff's expert testified that the design of the signal phases creates an unexpected conflict between pedestrians and automobiles turning right. He stated that that conflict is contrary to the Manual on Uniform Traffic Control Devices that the state has adopted for use in designing intersections. On the other hand, the premise of the state's immunity argument, which its expert witnesses supported, is that the decision to adopt the Manual was a policy decision for which discretionary immunity exists and that the design of the signals at the intersection complies with the Manual's requirements. We therefore begin by describing the relevant portions of the Manual.

Section 4B-5(1)(a) gives the meaning for a green ball signal:

"Traffic, except pedestrians, facing a CIRCULAR GREEN may proceed straight through or turn right or left except as such movement is modified by lane-use signs, turn prohibition signs, lane markings, or roadway design. But, vehicular traffic, including vehicles turning right or left, shall yield the right-of-way to other vehicles, and to pedestrians lawfully within the intersection or an adjacent crosswalk, at the time such signal indication is exhibited."

Section 4B-6(3) limits the use of a green ball signal to situations in which "it is intended to permit traffic to proceed in any direction which is lawful and practical." Unless a pedestrian signal indicates otherwise, "pedestrians facing any green indication, except when the sole green indication is a turn arrow, may proceed across the roadway within any marked or unmarked crosswalk." Section 4B-5(1)(c). Section 4D-2(3), provides that a "walk" signal for pedestrians

---

[2] Although the entrance road is unnamed, the parties at times refer to it as McBride Street because that is the name of the street that enters the west side of 82nd Street across from the entrance road.

"means that a pedestrian facing the signal indication may proceed across the roadway in the direction of the indication. The WALK indication means that there may or may not be possible conflict of pedestrians with turning vehicles."

Finally, section 4B-16 deals with unexpected conflicts between traffic movements:

"No movement that may involve an unexpected crossing of pathways of moving traffic during any green or yellow interval[,] except [when:]

"[1.] [T]he movement involves only slight hazard;

"[2.] Serious traffic delays are materially reduced by permitting the conflicting movement[;] and

"[3.] Drivers and pedestrians subjected to the unexpected conflict are effectively warned thereof.

"When such conditions, unexpected conflict exist, warning may be given by a sign or by use of an appropriate signal indication as set forth in section 4B-7. The foregoing applies to vehicle/pedestrian conflicts as well as to vehicle/vehicle conflicts."

According to plaintiff's expert witness, the intersection created an unexpected conflict as section 4B-16 of the Manual uses the term. He testified that the state could have minimized the conflict in either or both of two ways: first, by providing a "Walk" signal while the traffic light was still red, thus giving pedestrians a chance to start walking before cars came into the intersection, and, second, by posting a sign warning motorists making right turns to yield to pedestrians. He stated that other cities used the first method, and he provided pictures of signs in use at other locations with dedicated turn lanes, both near the Center and in Salem, that illustrate the second method. The expert then gave his opinion that the intersection signals did not meet the requirements of section 4B-16 of the Manual.

In contrast, the state's expert witnesses testified that the signals complied with the Manual. They emphasized that both section 4B-5(1)(a) of the Manual and ORS 811.040[3]

---

[3] On appeal the state also relies on ORS 811.010. Because that statute relates to crosswalks without any traffic control signals, it does not apply to this case.

require vehicles to yield to pedestrians who are lawfully within a signaled crosswalk. In their opinion, a green ball signal that permits a right turn and a "Walk" signal for pedestrians at the same time does not create a conflict that requires any action under section 4B-16.

In the ordinary case, such a disagreement between experts raises an issue for the jury. According to the state, however, its experts' testimony does not simply support its claim that it was not negligent when it designed the signals for the intersection. Rather, the state argues that it designed the signals in accordance with the policy decisions reflected in the Manual and that it is therefore immune from liability for that design.

The foundation of the state's argument is ORS 30.265(3)(c), which provides that a public body, and the public body's officers, employees, and agents acting within the scope of their employment or duties, are immune from liability for "[a]ny claim based upon the performance of or the failure to exercise or perform a discretionary function or duty, whether or not the discretion is abused." The leading case explaining discretionary immunity under ORS 30.265(3)(c) is *Stevenson v. State of Oregon*, 290 Or 3, 619 P2d 247 (1980). In *Stevenson*, the driver of a car entered an intersection against a red light, resulting in a collision with a truck that had a green light. There was evidence that, because of the angle of the intersection and inadequate shielding of the signal, the driver may have believed that the green light was intended for him rather than for the truck. One of the persons who was injured in the accident and the estate of the person who was killed recovered damages from the state. On appeal, the state argued that it was entitled to discretionary immunity for its decision on how to shield the signal. The Supreme Court disagreed and affirmed the judgment against the state.

The crux of the court's decision in *Stevenson* is its distinction between decisions that require the exercise of governmental discretion and those that require a technical but nonpolicy exercise of discretion. For example, a decision to build a highway rather than a railroad in a particular location is a governmental policy decision that cannot give rise to

liability under the statute. On the other hand, many decisions in the planning and design of highways require the exercise of some technical discretion but do not necessarily involve governmental policy choices. 290 Or at 9-11. In determining the nature of a decision, it is important to determine the administrative level where the decision was taken and the extent of policy choice delegated to that level. Thus, a decision not to install certain safety equipment because budgetary constraints limit the number of locations that can receive such equipment and other locations appear to need it more would be an immune policy decision. On the other hand, a failure to recognize the need for that equipment under established criteria would not be immune. *Id.* at 14-15.

The court's ruling in *Stevenson* illustrates the distinction. There, the state argued that the design and the shielding of traffic lights were appropriate matters for engineering judgment. There were frequent references in the testimony to guidelines established by national standards adopted by the state. Apparently the design complied with those guidelines. However, there was nothing in those standards that prevented appropriate changes to eliminate a hazardous condition, and there was nothing in the record to suggest that the design of the particular shield was made as a governmental policy decision. Consequently, the court held that the trial court did not err in submitting the issue of negligence to the jury.

The state asserts that it is immune in this case because its decision to adopt the Manual was a governmental policy decision of the kind contemplated by *Stevenson* and because it designed and constructed the signals at the intersection in accordance with the Manual. We rejected a similar argument in *Hall v. Dotter,* 129 Or App 486, 879 P2d 236 (1994). In that case, we held that, even if the applicable Manual constituted a policy decision, there was a disputed factual issue about whether the Manual actually controlled the placement of the particular signs and, if it did, whether the public employees who installed the traffic lights followed the criteria that the Manual established.

In this case, even if the state's decision to adopt the Manual is the kind of governmental policy decision that is

immune under ORS 30.265, we cannot say as a matter of law that the signals at the intersection comply with the Manual so that the design of the intersection is also immune. Some of the portions of the Manual that are in evidence, and on which the parties rely, simply describe the meanings of different signals; they do not require that a traffic engineer use a particular signal in designing a specific intersection. The description of the green ball signal in the Manual itself recognizes the possibility of conflicts with pedestrians when a driver makes a turn in reliance on such a signal. Although a driver has a duty under ORS 811.040 to yield to pedestrians within a crosswalk, and the existence of that duty may well be a relevant consideration in deciding what is required to warn drivers of hazards at a particular intersection, it does not follow from the fact of the statute that that decision is the kind of policy decision that *Stevenson* describes. Indeed, as the evidence suggests, it is not unusual for engineers to use warning signs despite the statutory requirement that drivers yield to pedestrians in the crosswalk. Section 4B-16 of the Manual specifically recognizes that there may be conflicts in various situations that will call for special signs or other measures. As the Manual states, in a portion that plaintiff's expert quoted on cross-examination, "qualified engineers are needed to exercise engineering judgment inherent in the selection of traffic control devices."

In sum, to the extent that the Manual reflects an immune policy judgment, that policy judgment did not dictate the design of the intersection of 82nd Street and the west entrance road to the Center.[4] Rather, the Manual provided some of the tools for engineers to use in exercising their engineering judgment in making that design. As the court pointed out in *Stevenson*, the burden is on the state to demonstrate how the decision was made at this particular intersection as part of establishing its immunity. Here, the state has not carried its burden. There is also conflicting expert testimony about whether the design complied with the Manual's requirements, and the Manual itself contemplates additional warning of unexpected conflicts. We conclude for these

---

[4] The state does not suggest that budgetary considerations affected its decision of how to design the signals.

reasons that the trial court erred in granting the state's motion for a directed verdict on the basis of discretionary immunity under ORS 30.265.

Plaintiff's assignment of error concerning the judgment in favor of Tamlyn involves an evidentiary issue that does not require discussion. Even assuming that the trial court erred, any error was harmless.

Judgment in favor of Oregon Department of Transportation reversed and remanded; otherwise affirmed.